UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MEHMET EMIN TATAS,

                            Plaintiff,

            – against –

ALI BABA'S TERRACE, INC., ALI
RIZA DOGAN, SENOL BAKIR, *and*
TOLGAHAN SUBAKAN,

                            Defendants.

**OPINION & ORDER**

19 Civ. 10595 (ER)

RAMOS, D.J.:

        Mehmet Emin Tatas, proceeding *pro se*, brings this action against his former

employer, the restaurant Ali Baba's Terrace, Inc. ("Ali Baba's"), the owner Ali Riza

Dogan, and two former coworkers Senol Bakir and Tolgahan Subakan, alleging, in part,

discrimination and hostile work environment claims on the basis of race, national origin,

and disability pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et*

*seq.* ("Title VII"), 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec.

Law § 296, *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C.

Admin. Code § 8-107, *et seq.* ("NYCHRL").  The defendants now move for partial

summary judgment pursuant to Federal Rule of Civil Procedure 56.  Doc. 86.[1]

Specifically, the defendants move for summary judgment on (1) the Title VII claims; (2)

all claims against Bakir and Subakan; (3) the discrimination claims based on Tatas' race

and national origin under 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL; (4) the

discrimination claims based on Tatas' disability under the NYSHRL and the NYCHRL;

(5) the hostile work environment claims under 42 U.S.C. § 1981, the NYSHRL, and the

NYCHRL; and (6) the claim for back pay damages.

---

[1] The defendants do not move for summary judgment on Tatas' claims of retaliation pursuant to the
NYSHRL.

For the reasons set forth below, the defendants' motion for partial summary judgment is GRANTED in part and DENIED in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  Factual Background[3]

#### i.    The Parties

Tatas was born in Diyarbakir, Turkey.  Doc. 93 at ¶ 25; Doc. 97 at ¶ 25.  He is Kurdish.  He emigrated to the United States in November 2010, and became a United States citizen on December 30, 2015.  Doc. 93 at ¶¶ 26–27; Doc. 97 at ¶¶ 26–27.

Ali Baba's is a Turkish restaurant located in Manhattan.  Doc. 93 at ¶ 1; Doc. 97 at ¶ 1.  Dogan is the owner and President of Ali Baba's.  Doc. 93 at ¶ 7; Doc. 97 at ¶ 7.  The parties dispute whether Dogan, who was born in Turkey, is also Kurdish.  Doc. 93 at ¶ 9; Doc. 97 at ¶ 9.[4]  Dogan asserts that he is Kurdish.

From January 2016 to May 2017, Bakir worked for Ali Baba's as the kitchen manager, and was responsible for organizing the kitchen, managing kitchen employees, and preparing orders for the customers.  Doc. 93 at ¶¶ 16–17; Doc. 97 at ¶¶ 16–17; Doc. 118 at 4 n.8.  Subakan worked for Ali Baba's as a chef.  Doc. 93 at ¶¶ 20, 22; Doc. 97 at ¶ 20.  As kitchen personnel, Bakir and Subakan did not have authority over the waiters, such as setting hours, overseeing job responsibilities, directing their daily work activities, providing discipline, hiring, firing, or other terms and conditions of employment or employment-related decisions.  Doc. 93 at ¶¶ 18, 23; Doc. 97 at ¶ 13.

---

[2] These facts are undisputed unless otherwise noted.

[3] The Court sets forth an abbreviated summary of the facts that are relevant to its determinations below.

[4] The defendants make arguments as to the strength of their evidence (and the insufficiency of Tatas' evidence) on this issue.  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### ii.     Subakan and Tatas

Prior to Tatas' employment at Ali Baba's, Subakan and Tatas were roommates for approximately eight months.  Doc. 93 at ¶ 33; Doc. 97 at ¶ 33.  At some point prior to or during their time as roommates, Subakan learned that Tatas was Kurdish.  The parties dispute when Subakan became aware of Tatas' Kurdish heritage and whether Subakan was bothered by the fact that Tatas was Kurdish.  Doc. 93 at ¶ 34; Doc. 97 at ¶ 34.[5]

### iii.     Inception of Tatas' Employment at Ali Baba's

Tatas began working at Ali Baba's as a waiter on November 15, 2011.  Doc. 93 at ¶¶ 40, 50; Doc. 97 at ¶¶ 40, 50.

The parties dispute whether Dogan was aware that Tatas was Kurdish when Tatas first began working at Ali Baba's.[6]  In October 2015, Dogan lent Tatas $1,000, so that Tatas could rent a house.  Doc. 93 at ¶ 55; Doc. 97 at ¶ 55.  The parties further dispute the quality of Tatas' work performance, including poor customer service skills and conflict with coworkers and managers.  Doc. 93 at ¶ 56; Doc. 97 at ¶ 56.  Nonetheless, Tatas got along well with Dogan until 2016.   Doc. 93 at ¶ 58; Doc. 97 at ¶ 58.

### iv.     February 2016 Incidents

The allegedly discriminatory conduct that forms the basis of Tatas' complaint did not begin until February 2016, approximately four-and-a-half years after he began working at Ali Baba's, when Tatas alleges that the defendants became aware that he is Kurdish.  Tatas alleges that in February 2016, when Subakan first began working at Ali Baba's, Subakan told Bakir that Tatas was Kurdish and a supporter of the Partiya

---

[5] While the defendants assert that Subakan already knew that Tatas was Kurdish prior to their becoming roommates, Tatas appears to dispute this fact.  Tatas further alleges that Subakan subjected him to assault and harassment when Subakan became aware he was Kurdish while they were roommates.  Doc. 93 at ¶¶ 34–35; Doc. 97 at ¶¶ 34–35.

[6] This fact is heavily disputed by the parties.  While the defendants assert that Dogan knew that Tatas was Kurdish from the outset of his employment, Tatas contends that he did not tell anyone at Ali Baba's that he was Kurdish.  Doc. 93 at ¶ 49; Doc. 97 at ¶ 49.

Karkerên Kurdistanê ("PKK").[7]  However, Subakan denies telling Bakir that Tatas was Kurdish, and Bakir denies knowing about Tatas' Kurdish descent until after Tatas was terminated.[8]  Tatas further alleges that Bakir, Subakan, and Dogan began verbally and physically assaulting him, including calling him a terrorist, when they became aware of his Kurdish heritage.  Doc. 93 at ¶¶ 59–60; Doc. 97 at ¶¶ 59–60.  The defendants deny that this alleged misconduct occurred.[9]

Similarly, the parties dispute whether the following three incidents in February 2016 occurred.[10]  First, Tatas asserts that on February 16, 2016, when he went into the kitchen to get ready for evening service, Bakir called him a "Kurdo terrorist" and said that Tatas and his son Emin Tatas ("Emin"), who also worked at Ali Baba's at the time, were members of the PKK and a disgrace to Turkey.  Doc. 93 at ¶ 72; Doc. 97 at ¶ 72.  When Tatas told Bakir not to speak to him like that, Bakir picked up a butcher knife, repeating that Tatas was a disgrace to Turkey and a terrorist.  Doc. 93 at ¶ 72; Doc. 97 at ¶ 72.  Bakir also said that Tatas needed to be killed.  Doc. 93 at ¶ 72; Doc. 97 at ¶ 72.  Other employees intervened and stopped Bakir.  Doc. 93 at ¶ 72; Doc. 97 at ¶ 72.  At his deposition, Tatas acknowledged that while Bakir picked up a knife, there was a partition between the two at all times.

---

[7] The defendants describe the PKK as a "left-wing organization based in Turkey and Iraq, considered by many (including [Tatas]) to be a terrorist organization," which has as its "stated goal the self-determination and freedom of Kurds."  Doc. 91 at 11 n.3.

[8] The defendants unequivocally stated in their declarations that Subakan never told Bakir that Tatas was Kurdish and that Bakir only learned that Tatas was Kurdish after Tatas asserted legal claims subsequent to his termination.  Doc. 93 at ¶¶ 62–63.  In addition to his deposition testimony and declaration, Tatas provides the affidavit of Eyyup Dogan ("Eyyup"), a coworker, who states that Subakan informed Bakir that Tatas was Kurdish.  Doc. 97 at ¶¶ 62–63.

[9] As described below, the defendants, in their motion and declarations, "categorically deny making any derogatory comments or statements to Plaintiff, or otherwise harassing or discriminating against Plaintiff, related to his race/national origin or purported disability."  Doc. 91 at 1; see also Doc. 88 at ¶ 19; Doc. 89 at ¶ 8; Doc. 90 at ¶ 9.

[10] As set forth below, the defendants deny these allegations in their declarations.  In support of his allegations, Tatas submits his declaration, his deposition testimony, and two affidavits from Eyyup Dogan and Emin, his coworkers.

Second, Tatas alleges that on the same day, he reported the incident with Bakir to Dogan.  Doc. 93 at ¶ 74; Doc. 97 at ¶ 74.  However, Dogan did not give him an opportunity to explain, and instead told him to find another job.  Doc. 93 at ¶ 75; Doc. 97 at ¶ 75.  In addition, Dogan accused Tatas of insulting customers and other employees. *Id*.  Tatas complained that Dogan was protecting the people who were racially harassing and discriminating against Tatas and his son.  *Id*.  Dogan then allegedly kicked Tatas in the groin, punched him, and spit on him.  *Id*.  Dogan also called Tatas a terrorist.  Doc. 97 at ¶ 75.  The co-manager Mursel Yalbuzdag and Emin intervened to separate Dogan and Tatas.  Doc. 93 at ¶ 76; Doc. 97 at ¶ 76.

Third, Tatas alleges that the next day, on February 17, 2016, Dogan informed Tatas that Turkish intelligence agents were investigating whether Tatas and his son were PKK members.  Doc. 93 at ¶ 82; Doc. 97 at ¶ 82.  This conversation became an argument, with Dogan stopping Tatas from leaving the office and pushing him.  Doc. 93 at ¶ 85; Doc. 97 at ¶ 85.  Dogan then spit in Tatas' face, slapped him, and hit his back and arms with a wine bottle.  Doc. 93 at ¶ 85; Doc. 97 at ¶ 85.  Tatas expressed that Dogan was making life "miserable" for him.  Doc. 93 at ¶ 87; Doc. 97 at ¶ 87.[11]

### v.    April 14, 2016 Visit to the CCHR

Tatas went to the New York City Commission on Human Rights ("CCHR") on April 14, 2016, to make an appointment to speak with an attorney there.  Doc. 93 at ¶ 99.  He received an appointment for June 2, 2016.  *Id.*  The parties dispute whether Tatas informed Dogan that he planned to go to the CCHR.  Doc. 93 at ¶ 100; Doc. 97 at ¶ 100.

### vi.    April 21, 2016 Incident

On April 21, 2016, Tatas sent an order to the kitchen.  Doc. 93 at ¶ 91; Doc. 97 at ¶ 91.  The kitchen sent a runner out to Tatas twice to ask about the order.  Doc. 93 at ¶ 92; Doc. 97 at ¶ 92.  Tatas then went to the kitchen twice to explain the order.  *Id.*  Afterward,

---

[11] Tatas submitted an audio recording of this February 17, 2016 incident and a certified translation.  Doc. 99-3, Ex. 25.

the kitchen sent a runner two more times. *Id.* Tatas reported this "harassment" to Dogan. Doc. 93 at ¶ 94; Doc. 97 at ¶ 94. Tatas explained that he could not take this conduct anymore, and that this type of behavior was happening all the time. *Id.*

### vii.    May 17, 2016 Surgical Procedure

Tatas learned that he had a basal cell carcinoma on his nose on May 2016. Doc. 93 at ¶ 104; Doc. 97 at ¶ 104. Tatas was not concerned about the diagnosis because he had spoken to his doctor and his daughter, who was studying nursing, and understood that spots like his healed at a rate of 97%. Doc. 93 at ¶ 106; Doc. 97 at ¶ 106. Tatas asserts that a week prior to his surgery, he notified Dogan of his surgical procedure and requested a week off following the surgery, a request which was denied. Doc. 93 at ¶¶ 109–10; Doc. 97 at ¶¶ 109–10.

Tatas had the surgery to remove the carcinoma on May 17, 2016. Doc. 93 at ¶ 108; Doc. 97 at ¶ 108. The day after the surgery, on May 18, Tatas went to work. Doc. 93 at ¶ 112; Doc. 97 at ¶ 112. That day, Tatas had difficulty concentrating at work due to the pain, and took painkillers. Doc. 93 at ¶ 111; Doc. 97 at ¶ 111. Dogan told him that he was not happy with "the situation in [Tatas'] nose" and that Tatas should go home and return when he felt better. Doc. 93 at ¶ 112; Doc. 97 at ¶ 112. The following day, on May 19, Dogan informed Tatas that his face did not look good for the customers and that the band-aid on his face would scare people. Doc. 93 at ¶ 113; Doc. 97 at ¶ 113. Dogan again advised him to go home and come back when he felt better. *Id.* Tatas chose to continue to work on both days. Doc. 93 at ¶ 114; Doc. 97 at ¶ 114. On the second or third day after the surgery, Tatas informed Yalbuzdag that he was having difficulty concentrating because of the pain from the procedure, but he continued to work because he was already on the work schedule and needed the money. Doc. 93 at ¶ 115; Doc. 97 at ¶ 115. Tatas returned to the doctor approximately 10 days to two weeks after the surgery to get the stitches removed. Doc. 97 at ¶ 107.

### viii.    May 27, 2016 Termination

On May 27, 2016, while Tatas was working, Dogan approached him, spit in his face, and called him a terrorist.  Doc. 93 at ¶ 120; Doc. 97 at ¶ 120.  Dogan said that he did not want Tatas to work there anymore, because (1) he did not want to work with people who are ungrateful and rude and (2) Tatas had complained about him to the CCHR and Department of Labor.  *Id.*

### ix.    EEOC Right-to-Sue Letter

Tatas filed an administrative complaint against Ali Baba's soon after he was fired in May 2016.  Doc. 93 at ¶ 136; Doc. 97 at ¶ 136.  Specifically, on June 30, 2016, he filed the complaint with the CCHR that was automatically dually filed with the U.S. Equal Employment Opportunity Commission ("EEOC").  *Id.*  That complaint was dismissed by the CCHR for administrative convenience.  Doc. 93 at ¶ 137; Doc. 97 at ¶ 137.  Tatas received a notice of administrative closure from the CCHR on September 20, 2017.  Doc. 93 at ¶ 137; Doc. 97 at ¶ 137.[12]  Although Tatas initially attempted to appeal the dismissal, he withdrew the appeal in December 2017.  Doc. 97 at ¶ 137.  Throughout 2018, Tatas' then-counsel sent communications to the EEOC to obtain a right-to-sue letter.  Doc. 93 at ¶ 138; Doc. 97 at ¶ 138.  Tatas discharged his counsel on May 21, 2019.  Doc. 93 at ¶ 139; Doc. 97 at ¶ 139.  The EEOC mailed Tatas' right-to-sue letter on May 24, 2019 to Tatas' residence.  Doc. 93 at ¶ 140; Doc. 87-10 (May 24, 2019 EEOC Right-to-Sue Letter).

### B.  Procedural Background

On May 16, 2017, Tatas filed a lawsuit in New York Supreme Court.  Doc. 1-2. Tatas filed a second lawsuit in New York Supreme Court over two years later, on September 18, 2019.  The defendants removed both lawsuits to this Court in November

---

[12] Certain exhibits have been submitted by both parties.  Where both parties have submitted the same documents, the Court will refer to the defendants' exhibits.

2019.  Doc. 1-1.  The Court consolidated these two cases into one action on the defendants' motion on December 17, 2019.  Doc. 21.

On November 19 and 20, 2019, Tatas drove his daughter, Sibel Tatas ("Sibel"), to the addresses he had for Bakir and Subakan to serve the 2019 complaint.  Doc. 93 at ¶ 147; Doc. 97 at ¶ 147.  Sibel informed Tatas that she knocked on the door of each residence and gave the paperwork to the person who answered.  Doc. 93 at ¶¶ 147, 149, 152; Doc. 97 at ¶ 147.  Tatas did not witness Sibel's delivery, nor did he or Sibel know who resided at either residence at the time of the alleged service.  Doc. 93 at ¶¶ 147–48; Doc. 97 at ¶¶ 147, 153–54.

Affidavits of service on Bakir and Subakan were filed.  Doc. 87-11; Doc. 87-12.  In the affidavit of service on Bakir, Sibel states that she served the paperwork at Bakir's address to a white individual who "refused to give [his] first name" and was five feet and nine inches to six feet tall, 161–200 pounds, 51–61 years old, and bald.  Doc. 87-11.  In the affidavit of service on Subakan, Sibel states that she personally delivered the paperwork at Subakan's address to a Black individual who "refused to give [his] first name" and was five feet and four inches to five feet and eight inches tall, 131–160 pounds, and 21–34 years old with black hair.  Doc. 87-12.

On January 13, 2020, Ali Baba's moved to dismiss the Title VII claims because Tatas failed to exhaust his administrative remedies; Dogan moved to dismiss the claims based on the two assaults that occurred in February 2016 as time-barred; and the restaurant's insurer, Admiral Insurance Co. ("Admiral"), moved to dismiss all counts alleged against Admiral for failure to state a claim.  On April 29, 2020, the Court granted the motions of Dogan and Admiral, and denied Ali Baba's motion.  Doc. 33.  Ali Baba's and Dogan answered the 2019 complaint, and Ali Baba's answered the 2017 complaint on May 13, 2020.  Docs. 34, 35.  Bakir and Subakan answered the 2019 complaint on July 22, 2020.  Docs. 47, 48.

The defendants moved for partial summary judgment on July 30, 2021.

On September 14, 2021, the defendants filed a notice of Ali Baba's bankruptcy and a motion to extend the automatic stay to the individual defendants. Doc. 104. On September 16, the Court granted the defendants' motion, and stayed the action in its entirety. Doc. 107. The defendants notified the Court of the resolution of Ali Baba's bankruptcy proceedings on January 3, 2022. Doc. 112. On the same day, the Court lifted the stay in the action. Doc. 113.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might "affect the outcome of the litigation under the governing law." *Id.* (quoting *Miner v. Clinton County N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)). The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March*

*of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

Courts hold submissions by *pro se* litigants to "less stringent standards than formal pleadings drafted by lawyers."  *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993) (quoting *Hughes v. Rowe*, 449 U.S. 5, 9 (1980)).  Courts must give "special solicitude" to *pro se* litigants in connection with motions for summary judgment.  *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).  A *pro se* party's papers opposing summary judgment are to be read liberally and interpreted to "raise the strongest arguments that they suggest."  *Clinton v. Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 481 (S.D.N.Y. 2011) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).  However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).  Thus, the special solicitude afforded *pro se* parties is not unlimited and does not "relieve" a plaintiff of his or her "duty to meet the requirements necessary to defeat a motion for summary judgment."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted).  "Nor is the 'duty to liberally construe a plaintiff's [opposition] . . . the equivalent of a duty to re-write it.'"  *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 65 (S.D.N.Y. 2016) (quoting *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009)).

## III.    DISCUSSION

### A.  Title VII Claims

The defendants argue that the Title VII claims should be dismissed because they are time-barred.

"Before an aggrieved party can assert a Title VII claim in federal court, he is generally required to exhaust the administrative remedies provided by the statute." *See Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018) (citation omitted). Specifically, a Title VII plaintiff generally must file an action in federal court within 90 days of receiving a right-to-sue letter from the EEOC. *See id.* at 621–22 (citing 42 U.S.C. § 2000e–5(f)(1)).   "Although *pro se* plaintiffs are entitled to leniency in other areas of litigation, the case law is clear:  The 90-day deadline is strictly enforced against represented and *pro se* plaintiffs alike." *Perez v. Mason Tenders Dist. Council Tr. Funds*, No. 17 Civ. 1022 (PAE) (AJP), 2017 WL 5125542, at *3 (S.D.N.Y. Nov. 1, 2017), *aff'd*, 742 F. App'x 584 (2d Cir. 2018).

"A notice from a government agency is presumed to be mailed on the date shown on the notice; there is a further presumption that the notice is received three days after its mailing." *Ziyan Shi v. N.Y. Dep't of State, Div. of Licensing Servs.*, 393 F. Supp. 3d 329, 342 (S.D.N.Y. 2019) (citing *Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 37 (2d Cir. 2011)).  This presumption "is not dispositive, however, if a claimant presents sworn testimony or other admissible evidence from which it could reasonably be inferred either that the notice was mailed later than its typewritten date or that it took longer than three days to [be received]." *Tiberio*, 664 F.3d at 37 (alterations and quotation marks omitted).  This includes, for example, "an affidavit by the claimant stating the actual date of receipt (or lack thereof)." *Johnson El v. New York City Admin. for Children's Servs.*, No. 19 Civ. 4352 (LGS), 2021 WL 293327, at *3 (S.D.N.Y. Jan. 28, 2021) (internal quotation marks and citation omitted); *see also Moore v. City of New York*, No. 15 Civ. 4578 (KPF), 2016 WL 3963120, at *7 (S.D.N.Y. July 21, 2016) ("This

presumption may be rebutted by admissible evidence that the document was not mailed, was received late, or was never received, but '[t]he mere denial of receipt does not rebut that presumption . . . .'" (internal citation omitted) (quoting *Meckel v. Continental Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985))).

The right-to-sue letter from the EEOC is dated May 24, 2019.  Doc. 87-10.  Tatas filed his complaint in New York Supreme Court on September 18, 2019, approximately four months after the presumed date of receipt of the letter.  Tatas asserts that he never received the letter, and that he was not aware of its existence until his correspondence with defense counsel in October 2019, after he filed the lawsuit.  However, he does not dispute that the mailing address listed on the letter was his residence.  Doc. 97 at ¶ 140.  In fact, Tatas testified that he received the earlier issued September 20, 2017 notice of administrative closure from the CCHR by mail at the same address.  Doc. 87-1 at Tr. 405:21–406:21.  Aside from the statement in his declaration that he did not receive the letter (Doc. 99 at ¶ 19),[13] Tatas fails to provide any explanation or evidence as to *why* he never received the letter, and therefore "fail[s] to rebut the presumption that he received a right-to-sue letter from the EEOC in the due course of mails."  *Loftin v. New York State Dep't of Mental Health*, 80 F. App'x 717, 718 (2d Cir. 2003) (citing *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525–26 (2d Cir. 1996)); *see also Johnson El*, 2021 WL 293327, at *3 (finding Title VII claims untimely where plaintiff's deposition testimony and affidavit established only that he experienced problems with his mail at times, but did not address to what extent the letter was delayed).  Accordingly, without sufficient evidence to the contrary, the letter is presumed to have been mailed on May 24, 2019 and received by May 27, 2019.  Although Tatas had 90 days from this receipt date to file a lawsuit, he did not do so until September 18, 2019 when he filed his second lawsuit in

---

[13] In addition, he attaches as an exhibit to his declaration an email correspondence dated October 11, 2019 between himself and his former attorney in which the attorney states that he believes the EEOC still has not issued the right-to-sue letter.  Doc. 99-4 at 36–38.

New York Supreme Court, approximately three weeks late.  Thus, the Title VII claims are untimely.

The Court considers whether the doctrine of equitable tolling, which is available in certain instances to toll statutory filing deadlines, applies here.  "As a general matter, a litigant seeking equitable tolling must establish two elements:  '(1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'"  *Bolarinwa v. Williams*, 593 F.3d 226, 231 (2d Cir. 2010) (quoting *Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (internal quotation marks omitted)).  "Equitable tolling applies only in the rare and exceptional circumstance."  *Bertin v. United States*, 478 F.3d 489, 494 n.3 (2d Cir. 2007) (citation omitted).  "The burden of demonstrating the appropriateness of equitable tolling" rests with the plaintiff.  *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000).

Here, the Court does not find any grounds on which the doctrine of equitable tolling is warranted.  Moreover, Tatas does not make any argument to the contrary.  Accordingly, the defendants' motion for summary judgment on the Title VII claims is granted.

### B.  Claims Against Bakir and Subakan

The defendants argue that because Bakir and Subakan were never properly served with the 2019 complaint, all claims against them must be dismissed for failure to serve pursuant to Federal Rule of Civil Procedure 4(m).  They also raised the defense of improper service of process in their answers, filed in July 2020.  Doc. 47 at ¶ 85; Doc. 48 at ¶ 85.

Both Bakir and Subakan have submitted declarations contesting Sibel's affidavits of service, asserting that the individuals described in those affidavits, Docs. 87-11, 87-12, do not match the descriptions of anyone in their respective residences.  Docs. 89, 90.  They also contend that neither they nor anyone residing with them were served.  *Id.*

"The defense of improper service of process . . . must be raised in a reasonably timely fashion or it is waived." *Fed. Home Loan Mortg. Corp. v. Dutch Lane Assocs.*, 775 F. Supp. 133, 136 (S.D.N.Y. 1991).  Although Bakir and Subakan did raise improper service of process in their answers, they have participated in litigating this case since 2019, only moving to dismiss on this basis in the instant motion, filed on July 2021, approximately 22 months after the matter was filed and 12 months after they interposed an answer. *Ahern v. Neve*, 285 F. Supp. 2d 317, 321 (E.D.N.Y. 2003) ("Although the plaintiff's service on the defendants was defective . . . [and] even if the defendants had asserted this defense in their answer, undue delay in challenging personal jurisdiction by a motion to dismiss may constitute a waiver." (internal quotation marks and citation omitted)); *see also Moss v. Wyeth, Inc.*, 872 F. Supp. 2d 154, 157 (D. Conn. 2012) ("Even where the defense of insufficient service was initially raised in a responsive pleading, courts have nevertheless held the defense waived when defendants continued to litigate the merits of the case without reasserting the defense." (citing *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61–62 (2d Cir. 1999))).

Moreover, Advisory Committee Notes on Rule 12(h) of the Federal Rules of Civil Procedure note that the specified defenses of Rule 12(b)(2)–(5), including the defense of insufficient service of process, "are of such a character that they should not be delayed." Fed. R. Civ. P. 12.  "Allowing parties to actively engage the judicial process yet delay in raising issues of technical defects in the proper form of service of process that could have been easily cured early on makes little sense and merely wastes precious judicial time and resources." *Fed. Home Loan Mortg. Corp.*, 775 F. Supp. at 137.  Even where service was insufficient—which the Court does not reach here—dismissal is not mandatory, because "the Court may dismiss the case or may, in its discretion, retain the case, quash service, and direct that service be effectuated properly." *Vega v. Hastens Beds, Inc.*, 339 F.R.D. 210, 217 (S.D.N.Y. 2021) (citation omitted).  Under these circumstances, since it is undisputed that Bakir and Subakan have had actual notice of the proceedings for well

over a year before bringing the instant motion, the Court finds that they have forfeited

this defense.  And even if they had not, the Court would exercise its discretion to retain

the case.  *Vega*, 339 F.R.D. at 217.  Accordingly, the defendants' motion for summary

judgment on all claims against Bakir and Subakan on the basis of improper service is

denied.

### C.  Discrimination Claims under 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL – Race and National Origin[14]

Section 1981 and NYSHRL claims are properly analyzed under the three-step

burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973).[15]  Under the *McDonnell Douglas* framework, a plaintiff

alleging discrimination must first demonstrate a *prima facie* case of discrimination.

*McDonnell Douglas*, 411 U.S. at 802.  The Second Circuit has explained that a plaintiff's

burden at this stage is *de minimis*.  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456,

467 (2d Cir. 2001).  Nonetheless, in order to state a *prima facie* case for discrimination,

"a plaintiff must proffer some admissible evidence of circumstances that would be

sufficient to permit an inference of discriminatory motive," *Bennett v. Watson Wyatt &*

*Co.*, 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002), and

"cannot meet its burden through reliance on unsupported assertions."  *Goenaga*, 51 F.3d

at 18.  "Statements that are devoid of any specifics, but replete with conclusions, are

insufficient to defeat a properly supported motion for summary judgment."  *Griffin v.*

*Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) (quoting *Bikerstaff v. Vassar*

*College*, 196 F.3d 435, 451–52 (2d Cir. 1999)).  "A plaintiff's self-serving statement,

---

[14] Tatas argues that he was demoted because of his race for the first time in his opposition.  The Court need not address this allegation, because it denies the defendants' motion for summary judgment on the race and national origin discrimination claims for failing to establish an absence of any genuine issue of material fact.

[15] *See, e.g.*, *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (analyzing Title VII and Section 1981 claims under same framework); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) (treating Title VII and NYSHRL discrimination claims identically).

without direct or circumstantial evidence to support the charge," is also insufficient. *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Civ. 9959 (WP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008).

If a plaintiff successfully presents a *prima facie* case of discrimination, the defendant must then rebut the presumption by offering legitimate and non-discriminatory reasons for the adverse employment action demonstrated in plaintiff's *prima facie* case. *Abdu-Brisson*, 239 F.3d at 468 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  "The employer need not *persuade* the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior."  *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (emphasis in original).  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  To satisfy the second step of *McDonnell Douglas*, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254.  "If the defendant carries this burden of production, the presumption [of discrimination] raised by the *prima facie* case is rebutted," and "drops from the case."  *Id.* at 255 n.10.

Under the third step of the *McDonnell Douglas* framework, the burden then shifts back to the plaintiff to prove intentional discrimination by a preponderance of the evidence.  *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 121 (2d Cir. 1997).  The Second Circuit has explained that "there are two distinct ways for a plaintiff to prevail—'either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions.'"  *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (quoting *Fields*, 115 F.3d at 121).  It is important to note, that "[a]lthough

intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253).

"[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [its] provisions 'broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible.'" *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citation omitted). The plaintiff must establish a *prima facie* case. *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75–76 (2d Cir. 2015). The defendant then has the opportunity to offer legitimate reasons for its actions. *See Bennett v. Health Mgmt. Sys.*, 936 N.Y.S.2d 112, 124 (N.Y. App. Div. 2011). If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude that (1) the defendant's "reasons were pretextual," *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 35 (N.Y. App. Div. 2012), or that (2) the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least "in part on discrimination." *Id.* at 41 (quoting *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009)). Summary judgment is appropriate if "the record establishes as a matter of law" that discrimination "play[ed] no role" in the defendant's actions. *Mihalik*, 715 F.3d at 110 n. 8 (quoting *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir.2013)); *see also Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38, 40 n.27 (N.Y. App. Div. 2009).

The defendants fail to demonstrate the absence of any genuine issue of material fact, thus precluding summary judgment on the race and national origin discrimination claims under Section 1981, the NYSHRL, and the NYCHRL. The defendants argue that Tatas failed to establish a *prima facie* case of race or national origin discrimination, because he cannot demonstrate an inference of discriminatory intent. In support of their

argument, however, they rely on disputed facts.  First, the defendants assert that Dogan was aware of Tatas' race or national origin from the outset of his employment.  Second, the defendants argue that Dogan is also Kurdish, which makes a discrimination claim less plausible.  Third, the defendants point to how Dogan showed Tatas respect and generosity from the outset of his employment by extending him a loan while being aware that Tatas was Kurdish.  Finally, and most notably, the defendants deny Tatas' allegations of verbal and physical assault, including being called a terrorist.  As set forth below, the defendants' arguments are wholly predicated on disputed facts.

At the outset, the Court notes that the defendants "categorically deny making any derogatory comments or statements to [Tatas], or otherwise harassing or discriminating against [Tatas], related to his race/national origin or purported disability."  Doc. 91 at 1. In their declarations, the individual defendants each state:  "I never harassed or discriminated against [Tatas] for any reason, let alone because he was Kurdish, and I never said anything to him (or his son) about being a terrorist or a member of the PKK." Doc. 88 at ¶ 19; Doc. 89 at ¶ 8; Doc. 90 at ¶ 9.[16]

First, the parties dispute whether Dogan is Kurdish.  Doc. 88 at ¶¶ 6, 11; Doc. 99 at ¶ 31.  Second, the parties also dispute when the individual defendants became aware of Tatas' national origin.  Specifically, in his declaration, Dogan states that he has known that Tatas was Kurdish since he began working at Ali Baba's.  Doc. 88 at ¶ 18.  Bakir states that Subakan never told him that Tatas was Kurdish, and he did not learn of Tatas' national origin until after Tatas was terminated, which was in May 2016.  Doc. 89 at ¶¶ 6–7; Doc. 93 at ¶ 63.  Similarly, Subakan states that he never told Bakir that Tatas was Kurdish, and that when he agreed to become roommates with Tatas, he already knew of Tatas' national origin.  Doc. 90 at ¶¶ 4, 8; Doc. 93 at ¶ 63.

---

[16] In their statement of undisputed facts, the defendants state that they "have conceded certain facts for the purposes of the instant motion that they do not believe are true (and, in fact, know are entirely false and the product of [Tatas'] revenge- and paranoia-filled psyche)."  Doc. 93 at 1 n.1.  They go on to "reserve the right to dispute [Tatas'] version of events, including those portions contained in this Statement, at trial."  *Id.*

In contrast, Tatas states in his declaration that Subakan learned that Tatas was Kurdish while they were roommates, and then proceeded to discriminate against and assault him.  Doc. 99 at ¶¶ 37–38.  Tatas further contends in his declaration that once Subakan began working at Ali Baba's in February 2016, Subakan informed Bakir that Tatas was Kurdish.  Doc. 99 at ¶ 37.  In addition to his deposition testimony, Tatas submitted an affidavit from Eyyup Dogan ("Eyyup"), Tatas' coworker, who stated that "Subakan started work at [Ali Baba's] on February 2016 and told [ ] Bakir that . . . Tatas was [ ] Kurdish."  Doc. 99-3, Ex. 27; *see also* Doc. 87-1 at Tr. 155:9–158:25.  Tatas asserts Dogan learned that he was Kurdish in February 2016 when he informed Dogan that he was being subjected to discrimination and harassment on the basis of his ancestry. Tatas alleges that Dogan then joined in on the alleged misconduct.  Doc. 99 at ¶ 40.

Third, the parties dispute the alleged misconduct that forms the basis of Tatas' discrimination and harassment claims.  As set forth above, the defendants unequivocally deny the alleged incidents of discrimination and harassment, including calling Tatas a terrorist, in their declarations.  Furthermore, the defendants characterize the misconduct at issue—such as calling Tatas a terrorist, the February 16, 2016 incident between Bakir and Tatas, the February 16, 2016 incident between Dogan and Tatas, and the February 17, 2016 incident between Dogan and Tatas—as allegations, indicating that the defendants do not concede that these incidents occurred.  *See, e.g.*, Doc. 93 at ¶¶ 61, 65, 72, 75 77, 85, 89–90.[17]  On the other hand, Tatas in his own declaration and deposition testimony describes in detail how Bakir, Subakan, and Dogan verbally and physically assaulted him on numerous occasions after they allegedly learned he was Kurdish.  *See, e.g.*, Doc. 99 at ¶¶ 42, 45, 49–50; Doc 87-1 at Tr. 166:4–170:21, 254:4-16, 278:14–283:6, 283:22– 287:15.  In addition, Tatas submitted affidavits from (1) Eyyup who witnessed verbal and physical attacks committed by Bakir, Subakan, and Dogan against Tatas (Doc. 99-3, Ex.

---

[17] In their reply, the defendants caveat their analysis with "[e]ven if Bakir and Subakan called [Tatas] a terrorist – *which they did not*."  Doc. 118 at 12 (emphasis added).

27),[18] and (2) Emin who similarly witnessed these verbal and physical attacks against Tatas (Doc. 99-3, Ex. 28).[19]  Tatas also submitted audio recordings, two of which recorded conversations between himself and Dogan on February 17, 2016 and April 21, 2016, and certified translations of the recordings.  Doc. 99-3, Ex. 25; Doc. 99-3, Ex. 30. In Tatas' translation of the February 17, 2016 audio recording, Dogan and Tatas discuss rumors that Tatas belongs to PKK, which results in a verbal and physical altercation. Doc. 99-3, Ex. 25.  After Dogan informed Tatas that Turkish intelligence agents were looking into whether Tatas and his son were members of PKK, there are numerous indications of "[s]ounds of hitting," "knocking," "glass shattering," and "fighting."  *Id.* at 10.  Tatas asks whether Dogan is threatening him, and tells him "you do all kinds of unfair stuff to me, you insult me . . . [y]ou harass me, you attack me."  *Id.* at 7.  Tatas also asked Dogan not to make life "hell" for him.  *Id.* at 11.[20]

---

[18] In his affidavit, Eyyup states that Subakan told Bakir that Tatas was Kurdish, but it is not clear whether he personally witnessed this.  Doc. 99-3, Ex. 27.  Eyyup states that he witnessed verbal and physical attacks by Bakir, Subakan, and Dogan against Tatas and Emin from the beginning of February 2016 through the end of March 2016.  With respect to the February 16, 2016 incident between Bakir and Tatas, Eyyup and Emin witnessed Bakir saying that Tatas and Emin were an insult to Turkey and attacking Tatas with a knife. Eyyup also witnessed Tatas reporting this incident to Dogan, who hit Tatas and told him to stop working for Ali Baba's.  Eyyup did not witness the February 17, 2016 incident between Dogan and Tatas.

[19] In his affidavit, Emin states that Bakir and Subakan started calling Tatas, another Kurdish coworker, and him "Kurdish terrorist[s]" and "traitors" on a daily basis.  Doc. 99-3, Ex. 28.  He also states that he and the other Kurdish coworker, both of whom were busboys, were forced to leave Ali Baba's because Bakir and Subakan did not want to work with Kurdish people.  He further states that although Tatas, the other Kurdish coworker, reported these incidents to Dogan, Dogan acted with Bakir and Subakan against them after he learned that they were Kurdish.  With respect to the February 16, 2016 incident between Bakir and Tatas, after Emin heard screaming, he and Eyyup went to the kitchen where he saw two kitchen employees restraining Bakir and taking a knife from his hand.  During this incident, Bakir stated that Kurdish people are a disgrace to Turkey, because they are terrorists and therefore need to be killed.  After this incident, Dogan called Emin to his office and started cursing at him.  Emin states that Dogan also called Tatas to his office where he proceeded to assault Tatas, spit in his face, and call Emin and Tatas terrorists.  Emin and Yalbuzdag then intervened in the altercation between Dogan and Tatas.  With respect to the February 17, 2016 incident, Dogan called Emin into his office to tell him that Tatas and Emin were being investigated by Turkish law enforcement for their alleged ties to PKK.  Emin did not witness the February 17, 2016 incident between Dogan and Tatas, but saw Tatas crying for 30 minutes after coming out of Dogan's office.

[20] Tatas attaches as an exhibit to his declaration the defendants' translation of the February 17, 2016 audio recording.  Doc. 99-4, Ex. 43.  The defendants' translation characterizes the sounds slightly differently, such as "[h]itting on a surface" and "[f]ighting noises."  *Id.* at 13, 17.

Accordingly, the defendants' motion for summary judgment on the race and national origin discrimination claims is denied, because they fail to establish the absence of a genuine dispute of material fact.[21]

### D. Discrimination Claims under the NYSHRL and the NYCHRL – Disability[22]

The defendants argue that Tatas failed to establish a *prima facie* case of disability discrimination under the NYSHRL and the NYCHRL.  Tatas brings harassment and discrimination claims against Dogan and Ali Baba's, based on the basal cell carcinoma on his nose, Dogan's treatment of him, and his termination in May 2016.  Doc. 93 at ¶ 102; Doc. 97 at ¶ 102.

The Second Circuit has determined that a plaintiff's discrimination claims under both the NYSHRL and the NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII.  *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (citation omitted).  "Under this test, a plaintiff establishes a *prima facie* case of discrimination by showing that:  (1) he was a member of a protected class; (2) he was competent to perform the job in question, or was performing the job duties satisfactorily; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of discrimination."  *Id.* (citation omitted).  "If the plaintiff succeeds in establishing a *prima facie* case of discrimination, a presumption of discrimination arises, and the burden shifts to the defendant, who must proffer some legitimate nondiscriminatory reason for the adverse action."  *Id.* (citation omitted).  "If

---

[21] Because the Court finds that the defendants failed to demonstrate the absence of a genuine dispute of material fact as to whether Tatas established an inference of discriminatory intent, it does not address the parties' remaining arguments.

[22] To the extent Tatas asserts a hostile work environment claim based on his disability, the Court agrees with the defendants that Tatas' opposition, aside from a stray reference to a hostile work environment claim, does not address or rebut the defendants' argument. *See* Doc. 98 at 14–17, 19–21.  Thus, the Court finds that Tatas has abandoned any such claim. *See Walker v. City of New York*, No. 14 Civ. 808 (ER), 2015 WL 4254026, at *3 (S.D.N.Y. July 14, 2015) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (quoting *Lipton v. Cnty. Of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)).

the defendant proffers such a reason, the presumption of discrimination . . . drops out of the analysis, and the defendant will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Id.* (citation omitted). "The plaintiff must demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant is actually pretext for discrimination." *Id.* (citation omitted).

"Under the NYSHRL, it is an unlawful discriminatory practice for an employer to discharge an individual because of a disability, which is [ ] 'a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques.'" *Id.* (quoting N.Y. Exec. Law §§ 292(21), 296(1)(a)).

"The NYCHRL makes it an unlawful discriminatory practice for an employer to discharge an employee 'because of the actual or perceived . . . disability' of that individual.'" *Id.* at 82 (quoting N.Y. City Admin. Code § 8–107(1)(a)). The NYCHRL defines "disability" as "any physical, medical, mental or psychological impairment," N.Y. City Admin. Code § 8–102(16)(a), which is defined, in relevant part, as "an impairment of any system of the body; including, but not limited to:  the neurological system; the musculoskeletal system; the special sense organs and respiratory organs, including, but not limited to, speech organs; the cardiovascular system; the reproductive system; the digestive and genito-urinary systems; the hemic and lymphatic systems; the immunological systems; the skin; and the endocrine system." *Id.* § 8–102(16)(b)(1). "This definition of disability is, on its face, broader than that provided by the NYSHRL." *Spiegel*, 604 F.3d at 82.[23]

---

[23] Courts have concluded that the NYSHRL and NYCHRL "have a broader definition of 'disability' than does the ADA; neither statute requires any showing that the disability substantially limits a major life activity."  *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 541 (S.D.N.Y. 2009) (citing *Giordano v. City of N.Y.*, 274 F.3d 740, 753 (2d Cir. 2001)).

The defendants argue that Tatas' carcinoma does not qualify as a disability within the meaning of the NYSHRL or NYCHRL.  Specifically, they argue that Tatas suffered only a temporary condition that is not protected by these laws.  *See Guary v. Upstate Nat. Bank*, 618 F. Supp. 2d 272, 275 (W.D.N.Y. 2009) (holding that broken ankle resulting in a twelve-week leave with no physical limitations thereafter was not a disability for purposes of the NYSHRL because it was a temporary condition); *Dillon v. Silverman*, No. 153549/2012, 2014 WL 1483666 (N.Y. Sup. Ct. Apr. 9, 2014) (holding that food poisoning resulting in two-week illness with no subsequent long-lasting or permanent disability did not qualify as a disability under the NYCHRL because it was a temporary condition).  Tatas responds that cancer can constitute a disability under the Americans with Disabilities Act (ADA).  *See Hoffman v. Carefirst of Fort Wayne, Inc.*, 737 F. Supp. 2d 976, 986 (N.D. Ind. 2010) (finding that Stage III renal cancer qualified as a disability within the meaning of the ADA where it would have substantially limited a major life activity when active and not in remission).

While cancer certainly can qualify as a disability under the NYSHRL and NYCHRL, *see Marullo v. Ellerbe Becket, Inc.*, No. 95 Civ. 4561 (FB) (MDG), 2001 WL 282772, at *17 (E.D.N.Y. Mar. 16, 2001) (holding that prostate cancer qualifies as a disability under the NYSHRL and NYCHRL), basal cell carcinoma of the type Tatas experienced simply does not impair the body in the same way as other types of cancer. Tatas returned to work the day after the surgery.  Although he experienced difficulty concentrating at work and took painkillers for the week following the surgery, he otherwise did not experience any other challenges or difficulties resulting from the carcinoma and his surgical procedure.  Thus, his condition is less impairing than the broken ankle and food poisoning cases discussed above in which courts held that those temporary conditions do not qualify as disabilities.  *See Guary*, 618 F. Supp. 2d at 275; *Dillon*, 2014 WL 1483666; *see also O'Donnell v. King B 100, LLC*, No. 14 Civ. 1345, 2016 WL 7742779, at *9 (N.D.N.Y. May 3, 2016) (holding that injuries sustained from

motorcycle accident which required little or no treatment and "did not otherwise limit his physical abilities" did not qualify as a disability under the NYSHRL).  Even drawing the inferences in favor of Tatas on this claim, the evidence in the record is insufficient to demonstrate a genuine factual dispute with respect to whether Tatas qualified as disabled under the NYSHRL and the NYCHRL.  Therefore, the Court finds that Tatas has failed to establish a *prima facie* case, because he has not shown that he was disabled.

Accordingly, the defendants' motion for summary judgment on the disability discrimination claims is granted.

### E.  Hostile Work Environment Claims under 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL – Race and National Origin

The same standards govern hostile work environment claims under Section 1981 and the NYSHRL.  *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014); *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 587 (S.D.N.Y. 2011) (noting that "hostile work environment claims under the NYSHRL are treated the same as claims under federal law").

To establish a hostile work environment claim, "a plaintiff must produce enough evidence to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)).  Additionally, it is "axiomatic" that the mistreatment is only actionable when it occurs because of an employee's protected characteristic, such as race or national origin.  *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  A plaintiff must also demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer.  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

To determine whether a plaintiff has met the burden of establishing a hostile environment, courts should "examin[e] the totality of the circumstances, including:  the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (quotation marks omitted); *see also Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).  Moreover, the "test has objective and subjective elements:  the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Alfano*, 294 F.3d at 374 (quotation marks omitted).

While acknowledging that "the standard for establishing a hostile work environment is high," the Second Circuit has "repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of [his] employment *altered for the worse.*'" *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (alteration and emphasis in original) (citing *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).  "[T]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Id.*

The standard to prevail on a hostile work environment claim under NYCHRL is lower. *Bermudez*, 783 F. Supp. 2d at 579.  One must show only "unequal treatment based upon membership in a protected class." *Nieblas-Love*, 165 F. Supp. 3d at 68 (citation omitted).  In other words, a plaintiff must show that he was "treated 'less well' because of discriminatory intent." *Colon v. Fashion Inst. of Tech. (State Univ. of New York)*, 983 F. Supp. 2d 277, 292 (S.D.N.Y. 2013) (quoting *Mihalik*, 715 F.3d at 110).  In evaluating a hostile work environment claim, the court must again look at the "totality of the circumstances." *Mihalik.*, 715 F.3d at 111 (citing *Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 58 (N.Y. App Div. 2012)).

The defendants argue that they are entitled to summary judgment on the hostile work environment claims under Section 1981, the NYSHRL, and the NYCHRL, because the alleged conduct was not sufficiently severe or pervasive and cannot be linked to racial animus. However, the defendants fail to demonstrate the absence of any genuine issue of material fact, thus precluding summary judgment.

As set forth above, the defendants unequivocally deny the alleged harassment that forms the basis of Tatas' claims. They assert in their motion and in the individual declarations that they never harassed or discriminated against Tatas, nor did they ever call Tatas a terrorist. Doc. 88 at ¶ 19; Doc. 89 at ¶ 8; Doc. 90 at ¶ 9; Doc. 91 at 1. To the contrary, Tatas states, in his declaration and deposition testimony, that Bakir and Subakan called him and his two Kurdish coworkers, including his son Emin, "terrorist" on a daily basis and "all the time." Doc. 99 at ¶ 1; Doc. 87-1 at Tr. 248:19–249:8, 250:22–251:5. Emin's affidavit expressly asserts that this occurred. Doc. 99-3 at ¶ 1. While the defendants allege that even if the allegations that Bakir and Subakan called him a terrorist are true, they are insufficient to form a claim for harassment. Doc. 91 at 23–25. However, the Court disagrees and finds that Tatas has set forth significant, probative evidence on which a reasonable factfinder could decide in his favor. *Senno*, 812 F. Supp. 2d at 467–68.

Next, the defendants again rely on arguments regarding when the individual defendants knew that Tatas was Kurdish and whether Dogan is also Kurdish. Specifically, they argue that Bakir did not know of Tatas' national origin, and therefore could not possibly have harassed Tatas on such a basis. Doc. 91 at 23 n.5. As to Subakan, the defendants assert that the claims against him are difficult to entertain, because he lived with Tatas after already knowing that Tatas was Kurdish. *Id.* at 25 n.7. As to Dogan, the defendants argue that (1) Dogan promptly addressed Tatas' complaints

about his coworkers and found no evidence of harassment[24] and (2) Tatas cannot prove that Dogan harassed him because of his race or national origin.  The defendants repeat their arguments that Tatas' claims are implausible, because Dogan is Kurdish.  Doc. 88 at ¶¶ 6, 11.  Finally, as to Ali Baba's, the defendants argue that the claims based on the conduct of Bakir, Subakan, and Dogan should be dismissed, because, in part, Tatas cannot demonstrate that Dogan harassed him on the basis of his race or national origin. In support of this argument, the defendants point to the same arguments made with respect to the discrimination and hostile work environment claims against Dogan.  As set forth above, Tatas disputes when the individual defendants became aware that he was Kurdish and whether Dogan is, in fact, Kurdish.  Thus, the defendants' arguments rely on disputed facts.

Accordingly, the defendants' motion for summary judgment on the hostile work environment claims is denied because they failed to establish the absence of a genuine dispute of material fact.

### F.  Claim for Back Pay Damages

The defendants argue that Tatas' claim for back pay damages must be dismissed. Under the NYSHRL and the NYCHRL, a plaintiff is generally, but not automatically, entitled to an award of back pay from the date of termination to the date of the judgment. *DeCurtis v. Upward Bound Int'l, Inc.*, No. 09 Civ. 5378 (RJS), 2011 WL 4549412, at *3 (S.D.N.Y. Sept. 27, 2011); *see also E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 164 F.3d 89, 100 (2d Cir. 1998).  Such an award should include pre-judgment interest.  *See Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994).  A prevailing plaintiff "must attempt to mitigate her damages by using reasonable diligence in finding other suitable

---

[24] Because the Court finds that the defendants failed to demonstrate the absence of any genuine issue of material fact as to whether Dogan harassed Tatas because of his race or national origin, it does not address the parties' remaining arguments regarding Dogan.

employment." *Dailey v. Societe Generale*, 108 F.3d 451, 455 (2d Cir. 1997) (citation omitted). "Any back pay award must be reduced by plaintiff's interim earnings." *Taddeo v. Ruggiero Farenga, Inc.*, 102 F. Supp. 2d 197, 198 (S.D.N.Y. 2000). "Where interim earnings exceed any back pay award, back pay is not appropriate." *Armstrong v. Trans World Airlines, Inc.*, No. 88 Civ. 1705 (MJL), 1991 WL 102511, at *3 (S.D.N.Y. May 29, 1991). Interim earnings are calculated for the time period between a firing and court judgment. *Taddeo*, 102 F. Supp. 2d at 198.

Tatas earned an average of $29,069.84 annually while working for the defendants. Doc. 93 ¶ 155. Since his termination on May 27, 2016, the defendants calculate that he now earns an average of $40,465.01 annually through wages and unemployment insurance benefits. *Id.* ¶ 156. Tatas does not dispute these amounts, but he does argue that unemployment insurance benefits should not be considered as earnings. Doc. 97 ¶ 156. Further, in his response to the motion, Tatas argues that the defendants' calculation of his earnings while working for the defendants is incorrect. Tatas' argument is difficult to parse, but the Court interprets his argument as follows: Based on the amount that Tatas earned in his last four months at Ali Baba's, he would have earned an average of $48,000 per year. Over the five years since his termination, he thus would have earned $240,000. However, as of July 2020, he had only earned $126,372.52. Therefore, he is owed $113,627.48 in back pay.

As to the inclusion of unemployment benefits in the calculation of his earnings, the Second Circuit has made clear that whether or not an award should be offset by such compensation is a discretionary determination to be made by the court. *Dailey*, 108 F.3d at 460–61. "Since this case has not yet been tried and no award has been made, it would be premature . . . to make a discretionary determination regarding whether or not the unemployment benefits Plaintiff earned should be deducted from any potential back pay award." *Taylor v. Polygram Recs.*, No. 94 Civ. 7689 (CSH), 1999 WL 124456, at *26 (S.D.N.Y. Mar. 8, 1999) (declining to rule on this issue at summary judgment).

Accordingly, a "decision on this issue, if necessary, will be deferred until after the case has been tried." *Id.*

Because the Court will not decide at this time whether unemployment benefits should be deducted from a backpay award, the Court cannot determine as a matter of law whether Tatas is entitled to recover backpay. Therefore, the defendants' summary judgment motion on Tatas' claim for back pay damages is denied.

## IV.   CONCLUSION

For the reasons discussed above, the defendants' motion for partial summary judgment is GRANTED in part and DENIED in part. The defendants' motion for summary judgment on the Title VII claims and the disability discrimination claims under the NYSHRL and the NYCHRL is granted. The defendants' motion for summary judgment on the claims against Bakir and Subakan on the basis of insufficient service, the race and national origin discrimination claims under Section 1981, the NYSHRL, and the NYCHRL, the hostile work environment claims under Section 1981, the NYSHRL, and the NYCHRL, and the claim for back pay damages is denied.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 86.

It is SO ORDERED.

Dated:   March 31, 2022
         New York, New York

_____
                    Edgardo Ramos, U.S.D.J.

29